**Opinion filed February 26, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00041-CR

_____

## DANNA PRESLEY CYR, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**

**Gaines County, Texas**

**Trial Court Cause No. 18-4835**

## O P I N I O N

The jury convicted Appellant, Danna Presley Cyr, of recklessly, by omission, causing serious bodily injury or serious mental deficiency, impairment, or injury to a child fourteen years of age or younger. *See* TEX. PENAL CODE ANN. § 22.04 (West 2019) (injury to a child). The jury assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of fifteen years.

In two issues on appeal, Appellant asserts that (1) the trial court erred in denying Appellant's proposed jury instruction and (2) the evidence was legally insufficient to support the verdict. We reverse and remand.

*Background facts*

On the night of the incident, Appellant and her husband, Justin Cyr, were at home near Denver City with their children J.D. and E.P. E.P. was five years old when the incident occurred, and J.D. was only four months old. E.P. testified that she saw Justin in the living room with J.D. while Appellant was in the kitchen. J.D. was crying, and Justin began to choke J.D.—while shouting obscenities at J.D.—to make J.D. "shut up." The record is unclear at what point Appellant became aware of Justin's conduct, but Appellant entered the living room and told Justin to "stop hurting the baby."

From the court reporter's transcription of the testimony given at trial, we note that neither of J.D.'s sisters who testified—E.P. and B.P.—stated that they had ever seen any violent *shaking* of their infant sister. The eldest child, B.P., stated that she had seen Justin—"more than once"—"choke" J.D. when J.D. would not stop crying. However, when questioned further, B.P. described to the jury only a single particular incident, and there was no testimony of anyone witnessing a violent shaking of J.D. B.P. testified as follows:

> Q. Now, did you ever see Justin do anything else to baby [J.D.] other than choking baby [J.D.]?
>
> A. It's been a long time, I don't remember.

B.P. could not recall if Justin used one or both hands. She gave no direct testimony that Appellant was there or knew of this previous incident. B.P. was not present during the incident on the night of June 29, 2013, that actually led to the hospitalization of J.D. on June 30. The younger sister, E.P., also testified. It was only E.P. who gave testimony of the events of the night of the incident as she saw

2

them from the hallway on the evening of the 29th. E.P. testified that, from the doorway of her bedroom, she saw Justin choking (not shaking) J.D.:

Q. . . . Can you tell the jury what you saw?

A. I saw Justin choking her.

Q. What else was he doing to her?

A. That's all I know.

Appellant, who had been in the kitchen, came into the living room and intervened, telling Justin "to stop hurting [J.D.]." At no time did E.P. state that she saw anyone shaking J.D., nor did E.P. state that Appellant would have seen anyone violently shaking J.D. While B.P. testified that she had witnessed Justin choke J.D. on prior occasions, B.P. was unsure whether she had ever told Appellant about the incidents or whether Appellant was ever aware of the previous incidents of harm. Of course, choking an infant is a heinous and abusive act, but it was violent shaking that the medical testimony concluded was the cause of brain injury to J.D.

Soon after Appellant intervened on June 29, she noticed J.D. "to be pail, limp and flailing arms about" for approximately twenty minutes—after which time J.D. apparently began acting normal again. Appellant and Justin called Justin's mother, a retired nurse, asking about the symptoms, and she told them to give J.D. Tylenol and watch J.D.'s condition; they followed her advice. Appellant and Justin did not take J.D. to the hospital at that time.

The next day, around 11:00 a.m., J.D. began having spasms, and Appellant and Justin took J.D. to the hospital in Lubbock. At the hospital in Lubbock, the medical team was concerned that J.D.'s injuries were caused by child abuse and called a special investigator with Child Protective Services (CPS) to look into the matter. Chief Deputy Patrick Kissick was assigned to the case. He spoke to the CPS investigator and then proceeded to the hospital to speak with Justin and Appellant. While speaking with Deputy Kissick at the hospital, Justin stated that he did not take

3

J.D. to the hospital in Denver City because he did not trust the doctors there. However, Appellant, "later in the summer," stated to her mother that they did not take J.D. to the hospital in Denver City because "Justin wanted to avoid CPS." Both Appellant and Justin repeated Justin's explanation that J.D.'s symptoms may have been caused by a "hard bowel movement," but neither mentioned Justin's actions.

Medical professionals examined J.D. and conclusively ruled out the possibility of her injuries being caused by a hard bowel movement; rather, the hemorrhaging in J.D.'s eyes and brain and the subdural hematoma were consistent with being violently shaken. Based on the evidence, Deputy Kissick obtained an arrest warrant and arrested Justin and Appellant for child abuse. During an interview, Appellant largely remained silent, but she stated that she was not aware of Justin's prior history of family violence and that she had told Deputy Kissick the truth at the hospital.

Dr. Curt Cockings, a pediatric ophthalmologist, testified that the retinal hemorrhaging seen in J.D.'s eyes was the result of being shaken using "very violent[,] severe, powerful forces." Dr. Patty Patterson, a board-certified pediatrician with a certified subspecialty in child abuse pediatrics, testified that J.D. presented with subdural hemorrhaging from ruptured bridging veins, which go across from the skull down into the arachnoids, and with swelling of the brain, which ultimately caused extensive damage to the brain tissue. The swelling reduced the blood and oxygen flow to J.D.'s brain. Dr. Patterson testified that the cause of J.D.'s injuries was a shaking of the child such that her delicate infant brain impacted repeatedly with the skull, stretching and exceeding the strength of the bridging veins, which then ruptured.

Appellant was indicted for recklessly, by omission, causing serious bodily injury or serious mental deficiency, impairment, or injury to a child by either failing to protect J.D. from Justin or failing to seek reasonable medical care for J.D. when

4

she had a duty to protect and care for J.D. After a trial on the merits, the jury convicted Appellant and sentenced her to fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

*Analysis*

I. *Concurrent Cause Instruction*

In her first issue, Appellant contends that the trial court erred in denying Appellant's proposed jury instruction on concurrent causation. The trial court included in its charge to the jury an abstract section with the essential elements of the offense, certain penal definitions, the law of parties, an application paragraph, the burden of proof, and other essential instructions. However, the trial court did not include an instruction on concurrent causation. Before the trial court read its charge to the jury, Appellant objected to the charge, stating that the charge failed to adequately include the statutory definition of "causation." Appellant's counsel cited Section 6.04 of the Penal Code, dictated the rule for concurrent causation to the trial court, and requested the trial court to include an instruction on concurrent causation in the court's charge. *See* PENAL § 6.04 (West 2011). Appellant stated that an instruction for concurrent causation should have been given because (1) the issue of concurrent causation was raised by the evidence, (2) Appellant centered her case around it, and (3) to deny the instruction would deprive Appellant of a fair trial. The trial court overruled the objection.

Appellant asserts that, because there was some evidence that Justin's conduct was clearly sufficient to cause the injuries and that Appellant's conduct was clearly insufficient to cause them, she was entitled to an instruction on the defense of concurrent causation. Therefore, Appellant contends, the trial court erred in failing to give the instruction, and Appellant was harmed by the court's error. We agree.

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred. *Id.* If no error occurred, our analysis ends. *Id.* If error occurred and was the subject of a timely objection in the trial court,

> then reversal is required if the error is "calculated to injure the rights of defendant," which means no more than that there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *see Carter v. State*, No. 11-17-00264-CR, 2019 WL 4316812, at *5 (Tex. App.—Eastland Sept. 12, 2019, no pet.) (mem. op., not designated for publication). In all situations, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

### A. Error

"If a defense is supported by the evidence, then the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007); *see Remsburg v. State*, 219 S.W.3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd) (citing *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993)). "Conversely, the defendant is not entitled to an instruction that is not raised by the evidence." *Remsburg*, 219 S.W.3d at 545; *see Shaw*, 243 S.W.3d at 658. Therefore, whether the trial court erred in refusing to give an instruction depends upon whether the issue was raised during trial. *See Shaw*, 243 S.W.3d at 658. "In deciding whether a

defensive theory is raised, the evidence is viewed in the light most favorable to the defense." *VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.) (citing *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)).

Section 6.04 of the Penal Code states: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, *unless* the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." PENAL § 6.04(a) (emphasis added); *see also Robbins v. State*, 717 S.W.2d 348, 350–52 (Tex. Crim. App. 1986) (clarifying the "unless" language to constitute a limitation on concurrent causes).

No standard exists, under Section 6.04 or any other authority, "that would help determine when the conduct of a party, but for which the result in question would not have occurred, is 'clearly sufficient' or 'clearly insufficient' to produce the result." *Westbrook v. State*, 697 S.W.2d 791, 793 (Tex. App.—Dallas 1985, pet. ref'd). "[B]eing a concept too difficult for lawyers or even for philosophers," the issue of causation is best left for jurors. *Id.* Thus, for Appellant to be entitled to an instruction on concurrent causation, "the record had to contain *some* evidence that the concurrent cause was clearly sufficient to produce the result and the conduct of [Appellant] clearly insufficient." *Remsburg*, 219 S.W.3d at 545 (emphasis added) (citing PENAL § 6.04(a); *Hutcheson v. State*, 899 S.W.2d 39, 42 (Tex. App.—Amarillo 1995, pet. ref'd)).

Although not addressed in the context of jury instructions, this court was presented with similar facts in *Wright v. State*, 494 S.W.3d 352 (Tex. App.—Eastland 2015, pet. ref'd). There, a mother was charged with injury to a child by omission where the mother's boyfriend had sexually abused the child, causing serious injury to the child, and the mother did not thereafter seek prompt medical attention for the child. 494 S.W.3d at 356, 361–63. Under those facts, we stated

7

that the State's case against the mother involved concurrent causes: the boyfriend's sexual abuse and the mother's failure to provide medical care. *Id.* at 362. We determined that the boyfriend's sexual abuse of the child was the initial cause of the child's injuries and was "obviously sufficient by itself to produce the result in the form of the physical injuries and mental injuries that [the child] suffered." *Id.* Thus, the mother's "criminal culpability for injury to a child by omission . . . hinge[d] on her response to [the boyfriend's] acts." *Id.*

Importantly, we noted that "it is not sufficient for the State to prove that the defendant failed to provide medical care for a serious bodily injury. 'Instead, it is necessary to prove that [the child] suffered serious bodily injury *because* [the defendant] failed to provide him medical care.'" *Id.* at 363 (alterations in original) (emphasis added) (quoting *Payton v. State*, 106 S.W.3d 326, 327–28 (Tex. App.—Fort Worth 2003, pet. ref'd)). We determined that the evidence did not show that the mother's failure to seek medical treatment actually caused any additional physical injuries, since medical treatment was not given to the child when the doctor examined her at the hospital. *Id.* Therefore, the conclusion that the mother caused the child to suffer serious bodily injury was conclusory and speculative, and "[a]s such, it [was] not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* at 364.

In the instant case, there was clearly some evidence that Justin's actions, by themselves, were sufficient to have caused J.D.'s injuries. *Cf. id.* Therefore, whether Appellant was entitled to a jury instruction on concurrent causes depends on whether there was some evidence that Appellant's conduct was clearly insufficient to cause J.D.'s injuries. *See Almanza*, 686 S.W.2d at 171; *Remsburg*, 219 S.W.3d at 545. Similar to *Wright*, the State contends that J.D.'s injuries "could have been mitigated by Appellant has [sic] she sought immediate medical attention." The State argued at trial that going to the hospital earlier "possibly[] could have

mitigated" the effects of J.D.'s shaken-baby syndrome. The State relied heavily on expert testimony that "it was possible" that J.D.'s injuries may have been lessened had Appellant sought immediate medical attention. *See Wright*, 494 S.W.3d at 363; *cf. Payton*, 106 S.W.3d at 330. Here, the expert admitted on cross-examination that she could not determine whether the chances of mitigation were "probable" or "over 50 percent or not"; she indicated that it was only ". . . possible. Just could happen, yes." Viewed in the light most favorable to Appellant, the record contains some evidence that Appellant's conduct was clearly insufficient to result in serious bodily injury or serious mental deficiency, impairment, or injury to J.D. Because the evidence raised the issue of concurrent causation, we conclude that the trial court erred in failing to include the instruction in its charge to the jury.

It is important to note that we do *not* find that Appellant's conduct was in fact clearly insufficient to cause J.D. serious bodily injury. Our decision merely holds that the record contains *some* evidence, when viewed in the light most favorable to Appellant, indicating that Appellant's conduct was clearly insufficient. Stated differently, our decision goes no further than to hold that a jury *could* have found Appellant's conduct clearly insufficient to cause J.D. serious bodily injury—had they been given the opportunity to view the evidence under a theory of concurrent causation.

### B. Harm

Concluding that the trial court erred by not including an instruction on concurrent causation, we must next determine whether the omission caused Appellant harm. *See Almanza*, 686 S.W.2d at 171; *Saenz v. State*, 474 S.W.3d 47, 53 (Tex. App.—Houston [14th Dist.] 2015, no pet.). As noted above, where a party properly preserves the error for review—as is the case here—then reversal is required so long as Appellant is caused *some* harm. *See Almanza*, 686 S.W.2d at 171. The Texas Court of Criminal Appeals clarified what constitutes "some harm"

9

in *Arline v. State* to mean that "the presence of *any* harm, regardless of degree, . . . is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if no harm has occurred." 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).

Here, Appellant primarily centered her defense around the theory of concurrent causation. In voir dire, for example, defense counsel presented the statutory definition of concurrent causation in an effort to explain what the State would have to prove. Throughout the trial, defense counsel repeatedly focused on the contention that Justin's conduct was sufficient by itself to cause the harm and that Appellant's conduct was insufficient. Thus, the trial court refused to offer an instruction on a theory that Appellant heavily relied upon. This ran the risk of confusing the jury, especially given the fact that the jury requested a definition of causation during their deliberations—which the trial court denied and, instead, referred them to the charge for its definition.

Moreover, this harm is compounded by the fact that the trial court included an instruction on the law of parties. Under the law of parties, a person is criminally responsible as a party to an offense if it is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. PENAL § 7.01(a). A person is criminally responsible for the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a). Under those circumstances, the principal actor's conduct is imputed to the party defendant; in other words, the principal's actions *are* the defendant's actions. *McKinney v. State*, 177 S.W.3d 186, 202 (Tex. App.—Houston [1st Dist.] 2005), *aff'd*, 207 S.W.3d 366 (Tex. Crim. App. 2006). Thus, "[o]ne's own actions or state generally cannot be a concurrent cause of one's criminal act[,]" and "the defendant's actions can never be 'clearly insufficient' to produce the result, as required by

10

section 6.04(a)." *Id.* (first citing *Robbins*, 717 S.W.2d at 351 n.2; then citing PENAL § 6.04(a)). A trial court's charge to the jury must include an abstract statement of the law and also an application of the law to the facts in the case. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004). Omission of the application portion of the charge is trial court error. *Gray*, 152 S.W.3d at 127–28; *see Vasquez v. State*, 389 S.W.3d 361, 366–69 (Tex. Crim. App. 2012) (addressing the inclusion of the law of parties in the application paragraph of a jury charge).

Although not complained of by Appellant, the trial court's failure to apply the law of parties within the charge further compounds the harm of not having given the concurrent causation instruction. In closing argument, the State read to the jury the trial court's instruction on the law of parties and yet made no application of same for the jury, leaving it without guidance in its application to these facts. The jury then sent a note to the trial court asking for a definition of causation, to which the trial court responded by merely directing the jury back to the charge. By including an instruction on the law of parties without application and without a Section 6.04 instruction, the trial court's charge presupposes that the law of concurrent causation is wholly inapplicable to the case, effectively prohibiting the jury's consideration of one of Appellant's primary defenses and presenting inadequate information to the jury on causation. After reviewing the entire record, we cannot say that the court's failure to instruct the jury on concurrent causation did not cause Appellant any harm.

Because the trial court erred in omitting an instruction on concurrent causation and because the error caused at least some harm to Appellant, we must reverse the judgment of conviction and remand the cause for a new trial consistent with this opinion. Appellant's first issue is sustained.

II. *Sufficiency of the Evidence*

In her second issue, Appellant contends that the evidence was insufficient to show that Appellant failed to protect J.D. and failed to provide reasonable medical care.

Unlike the standard of review for jury-charge error, we review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Appellant asserts on appeal that there is no evidence that she either caused or consciously disregarded a substantial and unjustifiable risk that she would cause serious bodily injury to J.D. by not taking J.D. to the hospital right away. We disagree.

"A person commits an offense if [s]he . . . recklessly by omission, causes to a child, . . . serious bodily injury . . . ." PENAL § 22.04(a) (West 2019). An omission causing serious bodily injury is "conduct constituting an offense under this section if . . . the actor has a legal or statutory duty to act." *Id.* § 22.04(b)(1). By statute, a parent has the "duty of care [and] protection" of the parent's child and the duty to provide the child with medical care. TEX. FAM. CODE ANN. § 151.001(a)(2), (3) (West 2014). With respect to the definition of reckless, the Penal Code provides:

> A person acts recklessly, or is reckless, with respect to . . . the result of h[er] conduct when [s]he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

PENAL § 6.03(c).

As noted in our review of Appellant's first issue, we did *not* find that the evidence was clearly insufficient to prove Appellant caused the injury. We only

found *some* evidence supporting that contention and only when viewed in the light most favorable to Appellant. Moreover, we did not find that Appellant did not have the requisite *mens rea* to complete the offense. To the contrary, we conclude that the evidence, when viewed in the light most favorable to the verdict, is sufficient to support a finding beyond a reasonable doubt that Appellant's failure to provide medical care recklessly caused serious bodily injury to J.D.

The instant case is readily distinguishable from this court's decision in *Wright*. Again, we held there that "it is necessary to prove that [the child] suffered serious bodily injury because [the defendant] failed to provide him medical care." *Wright*, 494 S.W.3d at 363 (alterations in original) (quoting *Payton*, 106 S.W.3d at 329). We found that the conclusion of whether a mother's failure to seek medical treatment actually caused the child's injuries was purely speculative specifically because "no medical treatment was given to [the child] when [the nurse] examined her at the hospital." *Id.* Therefore, we determined the evidence insufficient to prove causation.

Instead, the instant case more closely resembles *Payton*. In *Payton*, the grandfather of a child challenged the sufficiency of the evidence to establish that he recklessly caused serious bodily injury to the child by failing to seek reasonable medical care. 106 S.W.3d at 327–28. The court applied the same law concerning causation. *Id.* at 329. There, the child suffered internal bleeding that eventually led to the child's death. *Id.* at 330. Medical experts testified that the child would have been exhibiting symptoms of the injury after it occurred and that the grandparent would have noticed the symptoms—especially since the grandparent had a medical background. *Id.* More importantly, medical experts testified that, "although [the child] may have had long-term health problems, it was *possible* that he may have lived." *Id.* (emphasis added). Based on this evidence, the court determined that the evidence was legally sufficient to support the jury's verdict that the grandfather

14

recklessly caused serious bodily injury by failing to obtain reasonable medical care for the child. *Id.*

Here, the child promptly obtained significant medical care once the child was finally brought to the hospital in Lubbock—unlike the facts in *Wright*. Although Appellant did not have prior medical experience like the defendant in *Payton*, medical experts did testify that J.D. would have started exhibiting seizure-like symptoms immediately after injury and that "any observer would notice there's something wrong with the baby." Furthermore, Appellant admitted during her interview with Deputy Kissick that she initially wanted to take the child to the hospital that night—indicating awareness of the risk of serious harm to J.D. Additionally, medical experts testified that, although J.D. would have likely had serious bodily injury regardless of Appellant's delay, it was possible that the doctors could have stopped the swelling and that J.D.'s injuries could have been mitigated had the parents gotten J.D. to the hospital sooner.

Moreover, Appellant's mother, Deborah Presley, testified that, on the morning after J.D. had sustained the injuries, Appellant called Deborah and told her that she thought J.D. had just had a seizure. Deborah told Appellant to immediately take J.D. to the hospital in Denver City, which was only six miles away from where they lived. Instead, Appellant and Justin decided to take J.D. to the hospital in Lubbock, which was approximately seventy-five miles away. Although Appellant and Justin both told investigators that the reason they did not take J.D. to the hospital in Denver City was because Justin did not trust the doctors there, it was at least in part because Justin did not want CPS to get involved in Denver City—per a subsequent statement by Appellant to her mother. During the drive to Lubbock, J.D.'s seizures had apparently become so severe that Appellant had scratches on her neck from holding J.D. because "[J.D.] was thrashing so badly." Craig Crawford, the chief nursing officer at the hospital in Denver City, testified that, although personnel at the hospital in

Denver City could not have performed the necessary surgery to relieve pressure from the brain at that location, they would have "stabilized" J.D. and airlifted her to Lubbock. The chief nursing officer from the hospital in Seminole testified that stabilizing the child earlier "could possibly mitigate, maybe" the severity of the injuries.

While the evidence used to support the conviction in this case is attenuated and dependent on how the jury might weigh the credibility of the testimony and evidence presented, it is not so attenuated as to make the evidence insufficient to support the verdict. Whatever weight is to be given to the evidence, it is the sole province of the jury to make that determination, not the court. *See Jackson*, 443 U.S. at 326. Based on the record viewed in the light most favorable to the verdict, there is sufficient evidence for a jury to have found beyond a reasonable doubt that Appellant caused J.D. to have serious bodily injury by driving to a hospital much further away—so that Justin could prevent CPS from getting involved—instead of taking J.D. to a hospital only six minutes away from their residence, at which J.D. could have been stabilized and then airlifted to Lubbock. Additionally, such evidence also is sufficient for a jury to have found beyond a reasonable doubt that Appellant consciously disregarded a substantial and unjustifiable risk that she would cause J.D. serious bodily injury by failing to seek prompt medical care.

Having held that, viewing the evidence in a light most favorable to the verdict, there is sufficient evidence for a jury to have found beyond a reasonable doubt that Appellant recklessly caused J.D. serious bodily injury by failing to seek medical treatment, we decline to further address the issue of whether there is sufficient evidence that Appellant caused J.D. serious bodily injury by failing to protect J.D. Appellant's second issue is overruled.

16

*This Court's Ruling*

We reverse the judgment of the trial court and remand the cause for a new trial consistent with this opinion.

W. BRUCE WILLIAMS
JUSTICE

February 26, 2021

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.